## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEON FISCHER, derivatively on behalf of CABOT OIL & GAS CORPORATION, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| DAN O. DINGES, SCOTT C. SCHROEDER, DOROTHY M. ABLES, RHYS J. BEST, ROBERT S. BOSWELL, AMANDA M. BROCK, PETER B. DELANEY, ROBERT KELLEY, W. MATT RALLS, and MARCUS A. WATTS, | ) Case No.: ) ) ) ) ) ) |
| Defendants, | ) **JURY TRIAL DEMANDED** |
| and | ) ) |
| CABOT OIL & GAS CORPORATION, | ) ) |
| Nominal Defendant. | ) ) ) |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Leon Fischer ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Cabot Oil & Gas Corporation ("Cabot" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Dan O. Dinges, Scott C. Schroeder, Dorothy M. Ables, Rhys J. Best, Robert S. Boswell, Amanda M. Brock, Peter B. Delaney, Robert Kelley, W. Matt Ralls, And Marcus A. Watts (collectively, the "Individual Defendants," and together with Cabot, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Cabot, unjust enrichment, waste of corporate assets, violations of

Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cabot, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Cabot's directors and/or officers from October 23, 2015 through the present (the "Relevant Period").

2.      Cabot purports to be an independent oil and gas company involved in the development, exploitation and exploration of oil and gas in the United States. Cabot is primarily focused on the Marcellus Shale in Susquehanna County, Pennsylvania.

3.      In the Company's annual report filed on February 22, 2016 with the SEC on Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K"), Cabot disclosed that it had received a "proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania." Thereafter, in the Company's annual report filed on February 27, 2017 with the SEC on Form 10-K for the fiscal

2

year ended December 31, 2016 (the "2016 10-K), the Company disclosed that it had "entered into a Consent Order and Agreement with the PaDEP on December 30, 2016" agreeing to pay a civil monetary penalty of $300,000.  The Company also assured that "the source of methane has been remediated."

4.    On July 26, 2019, Cabot filed its quarterly report with the SEC on Form 10-Q for the quarterly period ended June 30, 2019 (the "2Q19 10-Q"), which disclosed that in June and November of 2017, PaDEP had served the Company with additional notices of violation relating to continued "gas migration allegations in an area surrounding several wells owned and operated by Cabot in Susquehanna County, Pennsylvania." The complaints were lodged by residents of the county concerning their supply of drinking water. Moreover, the Company disclosed that it had received two proposed Consent Order and Agreements from PaDEP, which exposed the Company to a combined civil monetary penalty of up to $570,000. PaDEP further required that Cabot "submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies[.]"

5.    On this news, Cabot's share price dropped $2.63 (over 12%) from closing at $21.79 per share on July 25, 2020, to close at $19.16 per share on July 26, 2019.

6.    On March 3, 2020, during an interview with the *Pittsburgh Post-Gazette*, the Attorney General of Pennsylvania, Josh Shapiro, revealed that "he is expending significant investigative resources in pursuit of more than a dozen criminal cases involving the shale gas industry[]" and anticipated "criminal charges in the near future."[1]

7.    Three months later, on June 15, 2020, Cabot was charged by the Pennsylvania

---

[1]    https://www.post-gazette.com/news/crime-courts/2020/03/03/shale-gas-fracking-pipelines-industry-PA-attorney-general-investigations/stories/202003030152. Last visited on November 12, 2020.

Attorney General's office with 15 criminal counts, including eight felonies, following a two-year state grand jury investigation into environmental crimes committed by shale gas companies across Pennsylvania. As reported by *The Seattle Times*, the grand jury investigation found that Cabot had "failed to fix faulty gas wells that are leaking methane into residential water supplies in Dimock and surrounding communities."[2]

8.    On this news, Cabot's share price dropped $0.67 (over 3.3%) from closing at $20.07 per share on June 12, 2020, to close at $19.40 per share on June 15, 2020.

9.    In breach of their fiduciary duties during the Relevant Period, the Individual Defendants made and/or caused the Company to make a series of materially false and/or misleading statements and omissions regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Cabot's environmental controls and procedures with regard to gas wells in Susquehanna County, Pennsylvania were inadequate, as they continuously failed to fix the ongoing stray gas migration in the area; (2) as a result, Pennsylvania's water supplies was polluted and endangering its citizens; (3) consequently, the Company was exposed to heightened governmental scrutiny—despite assurances minimizing the Company's potential environmental liabilities; (4) Cabot faced potential civil and/or criminal liabilities for its failure to fix the faulty gas wells; (5) these issues would foreseeably impact the Company's reputation and financial projections; and (6) Cabot would be incapable of achieving its growth projections. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

---

[2]    https://www.seattletimes.com/nation-world/nation/driller-charged-over-contamination-in-gasland-town/. Last visited on November 12, 2020.

10.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

11.     The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain adequate internal environmental controls and procedures to handle ensure it was complying with relevant environmental laws and regulations.

12.     Furthermore, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while one of them engaged in improper insider sales, netting proceeds of approximately over $1.8 million. According to the Company's annual and quarterly reports filed with the SEC during the Relevant Period, approximately 48,597,958 million shares of the Company's common stock were repurchased between May 2017 to June 2019 for over $1.15 billion. As the Company's stock was actually only worth $19.40 per share during that time, the price at closing on June 15, 2020, the Company overpaid by approximately $209 million in total.

13.     In light of the Individual Defendants' misconduct, which has subjected Cabot, its Chief Executive Officer ("CEO") and Chairman of the Board and its Chief Financial Officer ("CFO") and Executive Vice President to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Middle District of Pennsylvania (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal environment controls and procedures, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefited from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

14.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in failing to disclose material facts necessary to make the Company's public statements made not false and misleading, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Cabot's Board of Directors cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j, 78t), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f).

16.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19.    This derivative action is not a collusive action to confer jurisdiction on a court of

the United States that it would not otherwise have.

20.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

21.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

22.    Venue is proper in this District because Cabot and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.    Plaintiff is a current shareholder of Cabot. Plaintiff has continuously held Cabot common stock at all relevant times. Plaintiff is a citizen of the State of Kansas.

### Nominal Defendant Cabot

24.    Cabot is a Delaware corporation with its principal executive offices at 840 Gessner Road, Suite 1400, Houston, Texas 77024. Cabot's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "COG."

### Defendant Dinges

25.    Defendant Dan O. Dinges ("Dinges") joined the Company as a director in 2001 and has served as the Chairman of the Board, President and CEO since May 2002. According to the Company's Schedule 14A filed with the SEC on March 17, 2020 (the "2020 Proxy Statement"), as of February 1, 2020, Defendant Dinges beneficially owned 4,232,186 shares of the Company's common stock. Given that price per share of the Company's common stock at the close of trading

on January 31, 2020 was $14.09, Defendant Dinges owned approximately $59.6 million worth of Cabot stock.

26.     According to the 2020 Proxy Statement, for the fiscal year ended December 31, 2019, Defendant Dinges received $13,830,926 in total compensation from the Company. This included $1,090,392 in salary, $10,441,509 in stock awards, $1,930,500 in non-equity incentive plan compensation, and $368,525 in all other compensation.

27.     According to the 2020 Proxy Statement, for the fiscal year ended December 31, 2018, Defendant Dinges received $13,050,320 in total compensation from the Company. This included $1,035,581 in salary, $9,546,325 in stock awards, $2,100,000 in non-equity incentive plan compensation, and $368,414 in all other compensation.

28.     According to the 2020 Proxy Statement, for the fiscal year ended December 31, 2017, Defendant Dinges received $12,401,033 in total compensation from the Company. This included $960,580 in salary, $8,709,748 in stock awards, $2,437,500 in non-equity incentive plan compensation, and $293,205 in all other compensation.

29.     According to the Company's Schedule 14A filed with the SEC on March 22, 2018 (the "2018 Proxy Statement"), for the fiscal year ended December 31, 2016, Defendant Dinges received $11,311,837 in total compensation from the Company. This included $900,016 in salary, $8,327,237 in stock award, $1,856,250 in non-equity incentive plan compensation, and $228,334 in all other compensation.

30.     According to the 2018 Proxy Statement, for the fiscal year ended December 31, 2015, Defendant Dinges received $8,998,741 in total compensation from the Company. This included $900,016 in salary, $6,573,177 in stock award, $1,237,500 in non-equity incentive plan compensation, and $288,048 in all other compensation.

31.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Dinges made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| November 2, 2017 | 66,610 | $ 27.92 | $1,859,751 |

His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

32.     The 2020 Proxy Statement stated the following about Defendant Dinges:

Mr. Dinges brings to the Board over 36 years of executive management experience in the oil and gas exploration and production business, and as our Chief Executive Officer for the last 18 years, a deep knowledge of our business, operations, culture and long-term strategy and goals. Mr. Dinges joined the Company in September 2001, after a successful 20 year career in various management positions with the predecessor to Noble Energy, Inc., and has overseen an era of tremendous growth for the Company. His steadfast leadership as Chairman of the Board provides the Board with extensive institutional knowledge and continuity, as well creating a vital link between management and the Board. Mr. Dinges also possesses a diversity of corporate governance experience gained from service on the Board of United States Steel Corporation and several charitable and industry organizations, including American Petroleum Institute since 2017, American Exploration Production Council since 2002, Spitzer Industries, Inc. (private company) since 2006, and Houston Methodist Hospital Research Institute from 2014 to January 2020.

33.     Upon information and belief, Defendant Dinges is a citizen of the State of Texas.

**Defendant Schroeder**

34.     Defendant Scott C. Schroeder ("Schroeder") has served as the Company's Executive Vice President and CFO since February 2014. According to 2020 Proxy Statement, Defendant Schroeder beneficially owned 1,599,624 shares of the Company's common stock. Given that price per share of the Company's common stock at the close of trading on January 31, 2020 was $14.09, Defendant Schroeder owned approximately $22.5 million worth of Cabot stock.

35.     According to the 2020 Proxy Statement, for the fiscal year ended December 31, 2019, Defendant Schroeder received $6,516,082 in total compensation from the Company. This included $623,437 in salary, $4,746,113 in stock awards, $934,065 in non-equity incentive plan compensation, and $212,467 in all other compensation.

36.     According to the 2020 Proxy Statement, for the fiscal year ended December 31, 2018, Defendant Schroeder received $6,042,845 in total compensation from the Company. This included $590,402 in salary, $4,295,827 in stock awards, $960,000 in the non-equity incentive plan compensation, and $196,616 in all other compensation.

37.     According to the 2020 Proxy Statement, for the fiscal year ended December 31, 2017, Defendant Schroeder received $5,782,445 in total compensation from the Company. This included $535,590 in salary, $3,981,597 in stock awards, $1,100,000 in the non-equity incentive plan compensation, and $165,258 in all other compensation.

38.     According to the 2018 Proxy Statement, for the fiscal year ended December 31, 2016, Defendant Schroeder received $5,231,948 in total compensation from the Company. This included $475,010 in salary, $3,843,343 in stock awards, $783,750 in non-equity incentive plan compensation, and $129,845 in all other compensation.

39.     According to the 2018 Proxy Statement, for the fiscal year ended December 31, 2015, Defendant Schroeder received $4,205,929 in total compensation from the Company. This included $475,010 in salary, $3,033,773 in stock awards, $522,500 in non-equity incentive plan compensation, and $174,646 in all other compensation.

40.    The Company's website[3] stated the following about Defendant Schroeder:

SCOTT C. SCHROEDER

**Executive Vice President, Chief Financial Officer**

Prior to assuming his current position in February 2014, Mr. Schroeder served as Vice President, Chief Financial Officer and Treasurer for the Company since 2001 and Vice President and Treasurer since 1998. He joined Cabot in October 1995 as Assistant Treasurer. Before joining the Company, Mr. Schroeder held various management positions with Pride Petroleum Services and DeKalb Energy Company. Mr. Schroeder has a Bachelor of Science degree in Business Finance from Northern Illinois University and a Master of Business Administration degree from the University of Colorado.

41.    Upon information and belief, Defendant Schroeder is a citizen of the State of Texas.

**Defendant Ables**

42.    Defendant Dorothy M. Ables ("Ables") has served as a director of the Company since 2015. She also serves as the Chairman of the Audit Committee and as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of February 1, 2020, Defendant Ables beneficially owned 48,608 shares of the Company's common stock. Given that price per share of the Company's common stock at the close of trading on January 31, 2020 was $14.09, Defendant Ables owned approximately $684,886 worth of Cabot stock.

43.    According to the 2020 Proxy Statement, for the fiscal year ended December 31, 2019, Defendant Ables received $336,304 in total compensation from the Company. This included $90,000 in fees earned or paid in cash, $230,039 in stock awards, and $16,265 in all other compensation.

44.    According to the Company's Schedule 14A filed with the SEC on March 19, 2019 (the "2019 Proxy Statement"), for the fiscal year ended December 31, 2018, Defendant Ables

---

[3]    https://www.cabotog.com/management/scott-c-schroeder/.  Last visited November 11, 2020.

received $313,178 in total compensation from the Company. This included $75,000 in fees earned or paid in cash, $230,175 in stock awards, and $8003 in all other compensation.

45.     According to the 2018 Proxy Statement, for the fiscal year ended December 31, 2017, Defendant Ables received $281,246 in total compensation from the Company. This included $75,000 in fees earned or paid in cash, $200,010 in stock awards, and $6,236 in all other compensation.

46.     According to the Company's Schedule 14A filed with the SEC on March 21, 2017 (the "2017 Proxy Statement"), for the fiscal year ended December 31, 2016, Defendant Ables received $263,215 in total compensation from the Company. This included $62,500 in fees earned or paid in cash, $200,003 in stock awards, and $712 in all other compensation.

47.     According to the Company's Schedule 14A filed with the SEC on March 22, 2016 (the "2016 Proxy Statement"), for the fiscal year ended December 31, 2015, Defendant Ables received $6,250 in total compensation from the Company for fees earned or paid in cash.

48.     The 2020 Proxy Statement stated the following about Defendant Ables:

Ms. Ables brings a depth of experience in the natural gas transportation and marketing aspects of our industry, having served in positions of leadership with Spectra Energy Corp and its predecessor companies for over 30 years, as well as extensive financial expertise to our Board. The Board considered Ms. Ables' extensive experience in the pipeline, processing and midstream business as adding value to our stockholders at a time in our business when transportation is crucial to our strategy. Ms. Ables' financial expertise acquired through serving as Chief Financial Officer of Duke Energy Gas Transmission and later as Vice President of Audit Services of both Spectra Energy Corp and Duke Energy was also a key attribute leading to her appointment and to her February 2019 appointment as the Chairman of our Audit Committee. Most recently, Ms. Ables gained executive experience as the Chief Administrative Officer of Spectra Energy Corp, from 2008 until her February 2017 retirement effective upon Spectra's merger with Enbridge Inc. While serving in that role, Ms. Ables had responsibility for human resources, information technology, community relations and support services. Ms. Ables has prior governance experience gained from prior service on the Board of Directors for Spectra Energy Corp's publicly traded master limited partnership, Spectra Energy Partners, LP, and has served on the Board of Directors of BJ Services, Inc.

since July 2017 and Martin Marietta Materials Inc. since November 2018. Ms. Ables is also very active in community and charitable endeavors, including serving on the Board of Trustees of United Way of Greater Houston from 2008 to April 2016 and was re-appointed to the Board of Trustees in April 2018. This diversity of background and leadership experience make her a valuable contributor to our Board and to the Audit and Compensation Committees of our Board.

49.     Upon information and belief, Defendant Ables is a citizen of the State of Virginia.

**Defendant Best**

50.     Defendant Rhys J. Best ("Best") has served as a director of the Company since 2008. He also serves as the Chairman of the Compensation Committee and as a member of the Governance and Social Responsibility Committee.  According to 2020 Proxy Statement, as of February 1, 2020, Defendant Best beneficially owned 147,880 shares of the Company's common stock. Given that price per share of the Company's common stock at the close of trading on January 31, 2020 was $14.09, Defendant Best owned approximately $2 million worth of Cabot stock.

51.     According to the 2020 Proxy Statement, for the fiscal year ended December 31, 2019, Defendant Best received $368,277 in total compensation from the Company. This included $95,000 in fees earned or paid in cash, $230,039 in stock awards, and $43,238 in all other compensation.

52.     According to the 2019 Proxy Statement, for the fiscal year ended December 31, 2018, Defendant Best received $352,371 in total compensation from the Company. This included $93,750 in fees earned or paid in cash, $230,175 in stock awards, and $28,446 in other compensation.

53.     According to the 2018 Proxy Statement, for the fiscal year ended December 31, 2017, Defendant Best received $307,897 in total compensation from the Company. This included $90,000 in fees earned or paid in cash, $200,010 in stock awards, and $17,887 in all other compensation.

54.    According to the 2017 Proxy Statement, for the fiscal year ended December 31, 2016, Defendant Best received $297,601 in total compensation from the Company. This included $90,000 in fees earned or paid in cash, $200,003 in stock awards, and $7,598 in all other compensation.

55.    According to the 2016 Proxy Statement, for the fiscal year ended December 31, 2015, Defendant Best received $296,934 in total compensation. This included $90,000 in fees earned or paid in cash, $200,066 in stock awards, and $6,868 in all other compensation.

56.    The 2020 Proxy Statement stated the following about Defendant Best:

Mr. Best brings decades of significant management, leadership, transactional and financial experience to our Board. Mr. Best currently serves as Non-Executive Chairman of the Board of Arcosa, Inc., a provider of infrastructure-related products and solutions with leading positions in construction, energy and transportation markets, which was established as an independent company in November of 2018 in a spin-off from Trinity Industries, Inc. Mr. Best also currently serves as Non-Executive Chairman of the Board of MRC Global Inc., the largest global distributor, based on sales, of pipe, valves and fittings and related products and services to the energy industry. Prior to his appointment to this position with MRC Global in 2016, Mr. Best served as Non-Executive Chairman of the Board of Crosstex Energy L.P., a large publicly traded midstream company, from 2009 through its combination with the midstream assets of Devon Energy Corporation in 2014 to create EnLink Midstream Partners, LP, one of the largest midstream companies in the United States. This tremendous experience enables him to provide valuable insights into the transportation aspects of our business and enhances the overall strategic oversight capabilities of our Board. Mr. Best's distinguished career includes serving as Chairman and CEO of Lone Star Technologies, Inc., a former publicly traded company servicing the oil and natural gas industry, and holding positions of leadership in the banking industry. In addition to his considerable management and financial expertise, Mr. Best brings to bear an extensive corporate governance background from his current and former service on public company boards and the Board of the National Association of Corporate Directors, North Texas Chapter. This diverse experience enables Mr. Best to bring unique and valuable perspectives to the Board and makes him particularly qualified to serve as the Chairman of the Compensation Committee and a member of the Governance and Social Responsibility Committee of the Board.

57.    Upon information and belief, Defendant Best is a citizen of the State of Texas.

**Defendant Boswell**

58.    Defendant Robert S. Boswell ("Boswell") has served as a director of the Company since 2015. He serves as the Chairman of the Environment, Health and Safety Committee. He also serves as a member of the Audit and Governance and Social Responsibility Committees. According to the 2020 Proxy Statement, as of February 1, 2020, Defendant Boswell beneficially owned 50,086 shares of the Company's common stock. Given that price per share of the Company's common stock at the close of trading on January 31, 2020 was $14.09, Defendant Boswell owned approximately $705,711 worth of Cabot stock.

59.    According to the 2020 Proxy Statement, for the fiscal year ended December 31, 2019, Defendant Boswell received $336,083 in total compensation from the Company. This included $90,000 in fees earned or paid in cash, $230,039 in stock awards, and $16,044 in all other compensation.

60.    According to the 2019 Proxy Statement, for the fiscal year ended December 31, 2018, Defendant Boswell received $326,471 in total compensation from the Company. This included $88,750 in fees earned or paid in cash, $230,175 in stock awards, and $7,546 in all other compensation.

61.    According to the 2018 Proxy Statement, for the fiscal year ended December 31, 2017, Defendant Boswell received $281,612 in total compensation from the Company. This included $75,000 in fees earned or paid in cash, $200,010 in stock awards, and $6,602 in all other compensation.

62.    According to the 2017 Proxy Statement, for the fiscal year ended December 31, 2016, Defendant Boswell received $263,151 in total compensation from the Company. This

included $62,500 in fees earned or paid in cash, $200,003 in stock awards, and $648 in all other compensation.

63.    According to the 2016 Proxy Statement, for the fiscal year ended December 31, 2015, Defendant Boswell received $6,250 in total compensation from the Company for fees earned or paid in cash.

64.    The 2020 Proxy Statement stated the following about Defendant Boswell:

Mr. Boswell has management and operating experience as an executive in the upstream industry and brings an extensive technical understanding of the development of oil and gas reserves, as well as financial expertise to our Board. Mr. Boswell's distinguished career includes serving as Chairman and Chief Executive Officer of exploration and production companies for over 30 years, including overseeing the turnaround of Forest Oil Corporation, a mid-sized public exploration and production company, and the sale of Laramie Energy I, a private company which he founded, for over $1 billion. Throughout his career, Mr. Boswell has successfully led a number of upstream companies through the life cycle of capital-raising: growing reserves, production and profitability through both acquisitions and development of existing properties, and sale or merger and acquisition transactions. His most recent success with private companies Laramie Energy I and his current venture, Laramie Energy LLC, operating in the Piceance Basin, has provided him with tremendous experience in unconventional resource plays, which is relevant to the Company's operations in the Marcellus Shale. He also brings extensive financial expertise gained through both acting as Chief Financial Officer of public and private companies and supervising them as Chief Executive Officer. Mr. Boswell is currently serving as a director of Enerflex Ltd., a Canadian public company that manufactures and sells natural gas transmission and process equipment worldwide. Mr. Boswell's management, technical and financial expertise are a tremendous asset to our Board and the committees on which he serves, and his operations experience is invaluable to his service as Chairman of the Environment, Health & Safety Committee.

65.    Upon information and belief, Defendant Boswell is a citizen of the State of Colorado.

**Defendant Brock**

66.    Defendant Amanda M. Brock ("Brock") has served as a director of the Company since 2017. She also serves as a member of the Audit and Environment, Health and Safety

Committees. According to the 2020 Proxy Statement, as of February 1, 2020, Defendant Brock beneficially owned 22,220 shares of the Company's common stock. Given that price per share of the Company's common stock at the close of trading on January 31, 2020 was $14.09, Defendant Brock owned approximately $313,079 worth of Cabot stock.

67.    According to the 2020 Proxy Statement, for the fiscal year ended December 31, 2019, Defendant Brock received $313,688 in total compensation from the Company. This included $75,000 in fees earned or paid in cash, $230,039 in stock awards, and $8,649 in all other compensation.

68.    According to the 2019 Proxy Statement, for the fiscal year ended December 31, 2018, Defendant Brock received $307,831 in total compensation from the Company. This included $75,000 in fees earned or paid in cash, $230,175 in stock awards, and $2,656 in all other compensation.

69.    According to the 2018 Proxy Statement, for the fiscal year ended December 31, 2017, Defendant Brock received $96,555 in total compensation from the Company. This included $18,750 in fees earned or paid in cash, $76,229 in stock awards, and $1,576 in all other compensation.

70.    The 2020 Proxy Statement stated the following about Defendant Brock:

Ms. Brock was appointed in August 2017, adding to our Board her diverse experience and background, which she gained from her distinguished career building and managing global infrastructure businesses in the oil and gas, water and power industries. Ms. Brock is currently an investor in and the Chief Operating Officer and Chief Commercial Officer of Solaris Midstream, a private, growth-oriented midstream company that owns, operates and designs crucial water midstream assets across key unconventional U.S. basins. Ms. Brock joined Solaris in 2017 as the Senior Commercial Advisor and assumed her current positions in July and February 2018, respectively. Prior to that, Ms. Brock served as Chief Executive Officer of Water Standard, a water treatment company focused on water-based enhanced oil recovery, recycling and reuse of water and produced water treatment from 2009, and she remains as a strategic advisor and board member.

Prior to her appointment at Water Standard, Ms. Brock served as Executive Director and President, Americas, of Azurix, a global water treatment and services company and subsidiary of Enron Corp., from 1999 to 2002, and for Enron Corp. in various other capacities from 1991, including President of a division responsible for the management of power plants, related assets and joint ventures worldwide. Her expertise and depth of knowledge in the water management aspects of the oil and gas industry, as well as her global perspective, executive management and financial expertise, were considered by our Board as key attributes leading to her appointment. Ms. Brock has received numerous professional awards throughout her career, including being named one of the top 25 people globally in water and wastewater in 2016 by Water and Wastewater International, being named as a Houston Business Journal honoree for Women in Energy in 2016, and being inducted into the 2017 Greater Houston Women's Hall of Fame. Ms. Brock obtained her law degree from Louisiana State University, where she was a member of the Law Review, after completing her undergraduate studies in South Africa.

71.     Upon information and belief, Defendant Brock is a citizen of the State of Texas.

**Defendant Delaney**

72.     Defendant Peter B. Delaney ("Delaney") has served as a director of the Company since 2018. He also serves as a member of the Audit and Environment, Health and Safety Committees. According to the 2020 Proxy Statement, as of February 1, 2020, Defendant Delaney beneficially owned 25,850 shares of the Company's common stock. Given that price per share of the Company's common stock at the close of trading on January 31, 2020 was $14.09, Defendant Delaney owned approximately $364.226 worth of Cabot stock.

73.     According to the 2020 Proxy Statement, for the fiscal year ended December 31, 2019, Defendant Delaney received $309,455 in total compensation from the Company. This included $75,000 in fees earned or paid in cash, $230,039 in stock awards, and $4,416 in all other compensation.

74.     According to the 2019 Proxy Statement, for the fiscal year ended December 31, 2018, Defendant Delaney received $83,982 in total compensation from the Company. This included $6,250 in fees earned or paid in cash, $77,507 in stock awards, and $225 in all other

compensation.

75.    The 2020 Proxy Statement stated the following about Defendant Delaney:

Mr. Delaney is the newest member of our Board, appointed in August 2018 as the result of a succession planning process to identify a candidate with chief executive experience in the upstream or related industry. Mr. Delaney has a long and distinguished career in the energy and power industries, having retired in 2015 as the Chairman and Chief Executive Officer ("CEO") of OGE Energy Corporation, where he served in various capacities since 2002. During his eight-year tenure as Chairman and CEO, OGE Energy Corporation received numerous industry awards, among them the 2012 Utility of the Year and the 2013 Edison Award, the industry's highest honor. Mr. Delaney also served as CEO of Enogex, OGE Energy Corporation's natural gas midstream subsidiary, from 2002 to 2013, and in 2013, served as Chairman of its Board and later as interim CEO of its successor, Enable Midstream Partners, LP, until December 2015. Prior to his career at OGE Energy Corporation, Mr. Delaney completed a 16-year Wall Street investment banking career, most recently serving as Managing Director of UBS, Inc. from 1997 to 2001. This depth of leadership experience in the industry, as well as his financial expertise, were key aspects of his appointment to our Board and make him a valuable member of our Audit and Environment, Health & Safety Committees. Mr. Delaney also currently serves on the Board of Directors of Panhandle Oil & Gas and several private companies in unrelated industries, as well as several charitable and community organizations. Mr. Delaney has been hailed for his exemplary service to his industry and his community with several prestigious awards, including the Arthritis Foundation Tribute to Excellence (2015), the United Way Lifetime Achievement Award (2014), Energy Biz magazine's Utility CEO of the Year (2013) and the Journal Record Most Admired CEO of the Year (2012).

76.    Upon information and belief, Defendant Delaney is a citizen of the State of Oklahoma.

**Defendant Kelley**

77.    Defendant Robert Kelley ("Kelley") has served as a director of the Company since 2003. He serves as Chairman of the Executive committee. He is also a member of the Audit and Governance and Social Responsibility Committees. According to the 2020 Proxy Statement, as of February 1, 2020, Defendant Kelley beneficially owned 699,890 shares of the Company's common stock. Given that price per share of the Company's common stock at the close of trading on January 31, 2020 was $14.09, Defendant Kelley owned approximately $9.8 million worth of Cabot stock.

78.    According to the 2020 Proxy Statement, for the fiscal year ended December 31, 2019, Defendant Kelley received $412,974 in total compensation from the Company. This included $110,500 in fees earned or paid in cash, $230,039 in stock awards, and $72,935 in all other compensation.

79.    According to the 2019 Proxy Statement, for the fiscal year ended December 31, 2018, Defendant Kelley received $400,282 in total compensation from the Company. This included $122,500 in fees earned or paid in cash, $230,175 in stock awards, and $47,607 in all other compensation.

80.    According to the 2018 Proxy Statement, for the fiscal year ended December 31, 2017, Defendant Kelley received $346,894 in total compensation from the Company. This included $115,000 in fees earned or paid in cash, $200,010 in stock awards, and $31,884 in all other compensation.

81.    According to the 2017 Proxy Statement, for the fiscal year ended December 31, 2016, Defendant Kelley received $325,988 in total compensation from the Company. This included $112,500 in fees earned or paid in cash, $200,003 in stock awards, and $13,485 in all other compensation.

82.    According to the 2016 Proxy Statement, for the fiscal year ended December 31, 2015, Defendant Kelley received $312,821 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $200,066 in stock awards, and $12,755 in all other compensation.

83.    The 2020 Proxy Statement stated the following about Defendant Kelley:

Mr. Kelley's extensive experience in the financial, accounting and executive management of public energy companies, as well as corporate governance experience as a director of several public energy companies, makes him particularly valuable as a member of our Board and as our Audit Committee Chairman from

2008 to February 2019. Mr. Kelley's experience as President and CEO and later Chairman of the Board of Noble Energy Inc. provides him with valuable operational, leadership and management experience. Mr. Kelley's accounting and finance background gained while serving industry clients as a CPA for a national public accounting firm and while serving in positions of senior leadership in accounting and finance roles at a predecessor to Noble Energy Inc. also brings vital financial expertise to our Audit Committee. Mr. Kelley's 16 years of service to our Board provides a continuity of leadership and an understanding of our business and strategy that is crucial to the effective functioning of our Board. This depth of experience with Cabot is especially valuable in his role as our Lead Director.

84.    Upon information and belief, Defendant Kelley is a citizen of the State of Texas.

**Defendant Ralls**

85.    Defendant W. Matt Ralls ("Ralls") has served as a director of the Company since 2011. He is the Chairman of the Governance and Social Responsibility Committee. He also serves as a member of the Compensation and Executive Committees. According to the 2020 Proxy Statement, as of February 1, 2020, Defendant Ralls beneficially owned 91,925 shares of the Company's common stock. Given that price per share of the Company's common stock at the close of trading on January 31, 2020 was $14.09, Defendant Ralls owned approximately $1.2 million worth of Cabot stock.

86.    According to the 2020 Proxy Statement, for the fiscal year ended December 31, 2019, Defendant Ralls received $352,919 in total compensation from the Company. This included $90,000 in fees earned or paid in cash, $230,039 in stock awards, and $32,880 in all other compensation.

87.    According to the 2019 Proxy Statement, for the fiscal year ended December 31, 2018, Defendant Ralls received $338,665 in total compensation from the Company. This included $88,750 in fees earned or paid in cash, $230,175 in stock awards, and $19,740 in all other compensation.

88.     According to the 2018 Proxy Statement, for the fiscal year ended December 31, 2017, Defendant Ralls received $307,969 in total compensation from the Company. This included $95,000 in fees earned or paid in cash, $200,010 in stock awards, and $12,959 in all other compensation.

89.     According to the 2017 Proxy Statement, for the fiscal year ended December 31, 2016, Defendant Ralls received $296,702 in total compensation from the Company. This included $92,500 in fees earned or paid in cash, $200,003 in stock awards, and $4,199 in all other compensation.

90.     According to the 2016 Proxy Statement, for the fiscal year ended December 31, 2015, Defendant Ralls received $283,212 in total compensation from the Company. This included $80,000 in fees earned or paid in cash, $200,066 in stock awards, and $3,146 in all other compensation.

91.     The 2020 Proxy Statement stated the following about Defendant Ralls:

Mr. Ralls' diverse operational, financial and executive management experience in various roles in the oil and gas industry, including most recently within the drilling segment of the industry, provides the Board with a wealth of expertise from which to draw. Mr. Ralls' recent service as President and Chief Executive Officer of Rowan Companies plc, and his combined 15 years' executive management experience at Rowan Companies plc and GlobalSanteFe Corporation, both international contract drilling companies, provides valuable management and financial expertise and insight into an aspect of our business that represents a significant portion of our capital expenditure budget. Prior to his drilling industry experience, Mr. Ralls served as Executive Vice President of a public upstream oil and gas company, which gave him a thorough understanding of our core business. In his service to the Board, Mr. Ralls is also able to draw from his 17 years of experience in various banking management positions with three large Texas-based commercial lenders to the energy industry. Mr. Ralls' extensive public company board experience makes him an invaluable member of the Governance and Social Responsibility Committee and Chairman since 2015. His effectiveness chairing such committee is enhanced by his positions of leadership on the boards of several industry trade associations, including the International Association of Drilling Contractors and the American Petroleum Institute.

92.    Upon information and belief, Defendant Ralls is a citizen of the State of Texas.

**Defendant Watts**

93.    Marcus A. Watts ("Watts") has served as a director of the Company since 2017. He also serves as a member of the Compensation and Environment, Health, and Safety Committees. According to the 2020 Proxy Statement, as of February 1, 2020, Defendant Watts beneficially owned 22,220 shares of the Company's common stock. Given that price per share of the Company's common stock at the close of trading on January 31, 2020 was $14.09, Defendant Watts owned approximately $313,079 worth of Cabot stock.

94.    According to the 2020 Proxy Statement, for the fiscal year ended December 31, 2019, Defendant Watts received $313,680 in total compensation from the Company. This included $75,000 in fees earned or paid in cash, $230,039 in stock awards, and $8,641 in all other compensation.

95.    According to the 2019 Proxy Statement, for the fiscal year ended December 31, 2018, Defendant Watts received $307,831 in total compensation from the Company. This included $75,000 in fees earned or paid in cash, $230,175 in stock awards, and $2,656 in all other compensation.

96.    According to the 2018 Proxy Statement, for the fiscal year ended December 31, 2017, Defendant Watts received $97,756 in total compensation from the Company. This included $18,750 in fees earned or paid in cash, $76,229 in stock awards, and $2,777 in all other compensation.

97.    The 2020 Proxy Statement stated the following about Defendant Watts:

Mr. Watts joined our Board in August 2017, adding a wealth of legal, transactional and management expertise from both the oil and gas industry and other industries to our Board. Mr. Watts has served as President of The Friedkin Group, an umbrella company overseeing various business interests that are principally automotive-

related, since 2011, after over 26 years of legal experience with the international law firm of Locke Lord LLP. In his prior experience with Locke Lord LLP, Mr. Watts focused on corporate and securities law, governance and related matters and served as the Managing Partner of the Houston, Texas office and Vice-Chairman of the firm-wide Executive Committee. Mr. Watts' combination of legal and management talent is unique on our Board and he offers a fresh perspective from an industry other than our own, as well as years of experience representing oil and gas companies in his private law practice. This industry experience, as well as his legal and regulatory background, is particularly valuable to our Compensation and Environment, Health & Safety Committees of the Board, on which he serves. Mr. Watts served as a director of Complete Production Services until its merger with Superior Energy Services in 2012 and currently serves on the Board of Directors of Service Corporation International. He has also served on the boards of the Federal Reserve Bank of Dallas-Houston Branch since 2014 and the Greater Houston Partnership since 2012 and is the former Chairman of both organizations. Mr. Watts holds a law degree from Harvard Law School and a B.S. degree in Mechanical Engineering from Texas A&M University.

98. Upon information and belief, Defendant Watts is a citizen of the State of Texas.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

99. By reason of their positions as officers, directors, and/or fiduciaries of Cabot and because of their ability to control the business and corporate affairs of Cabot, the Individual Defendants owed Cabot and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Cabot in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Cabot and its shareholders so as to benefit all shareholders equally.

100. Each director and officer of the Company owes to Cabot and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

101. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Cabot, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

102.    To discharge their duties, the officers and directors of Cabot were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

103.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Cabot, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Cabot's Board at all relevant times.

104.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

105.    To discharge their duties, the officers and directors of Cabot were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Cabot were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Pennsylvania, and the United States, and pursuant to Cabot's own Code of Business Conduct, Cabot's Environment, Health and Safety Committee Charter, and Cabot's Audit Committee Charter (defined below);

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Cabot conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Cabot and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Cabot's operations would comply with all applicable laws and Cabot's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

106.      Each of the Individual Defendants further owed to Cabot and the shareholders the duty of loyalty requiring that each favor Cabot's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

107.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Cabot and were at all times acting within the course and scope of such agency.

108.      Because of their advisory, executive, managerial, and directorial positions with Cabot, each of the Individual Defendants had access to adverse, non-public information about the Company.

109.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by Cabot.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

110.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

111.    The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act.

112.    The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Cabot, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

113.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

114.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Cabot and was at all times acting within the course

and scope of such agency.

## CABOT'S CODE OF BUSINESS CONDUCT

115.    The Company's Code of Business Conduct "define[s] certain responsibilities of the Company's employees" and "is [a] guide to ethical and lawful conduct and serves as a reminder of the policies, roles and laws that affect [their] performance."

116.    The Code of Business Conduct requires that all Company "directors, officers and employees [] comply with the letter and the spirit of all applicable laws, rules and regulations and [] conduct its affairs in the highest moral and ethical manner possible. We obey laws, rules and regulations, whether we agree with them or not."

117.    The Code of Business Conduct further provides that each employee must "immediately report any suspected violations of laws, rules or regulations or unethical conduct (including violations of this Code) connected with the business of the Company or its subsidiaries to their supervisor and the Corporate Secretary."

118.    The Code of Business Conduct also provides that Cabot's directors, officers, and employees are committed to "full, fair, accurate, timely and understandable disclosure in reports and documents the Company files with or submits to the SEC and in other public communications made by the Company."

119.    Pursuant to the Code of Business Conduct, Cabot's Directors and officers "should comply with all governmental laws, rules and regulations, including insider trading laws."

120.    In a section titled, "Transactions in Securities" the Code of Business Conduct states that:

> The United States securities laws prohibit persons from trading on material information which has not been made public. No employee (nor any person acting on such employee's behalf) who is aware of material information relating to the Company or another company that has not been generally available to the public … may sell or purchase shares of the stock or other securities (or puts, calls or

similar options to buy or sell stock or other securities) of COGC or the other company.

121.    The Code of Business Conduct defines material information as "any information that a reasonable investor would be likely to consider important in deciding whether to buy, sell or hold securities of that company."

122.    In a section titled, "Company Information/Confidentiality," the Code of Business Conduct states that:

> Misleading Information. No employee will withhold or conceal information requested by the Company's directors, officers, legal counsel, internal auditors, independent public accountants or any other person authorized by an executive officer of the Company to receive it. Also, no employee will furnish misleading information to the Company's directors, officers, legal counsel, internal auditors, independent public accountants or any other person authorized by an executive officer of the Company to receive it.

123.    In a section titled, "The Environment," the Code of Business Conduct states that:

> It is Company policy to comply fully with the letter and the spirit of all applicable federal, state, and local environmental protection laws and regulations (the "Environmental Laws"). The Company will conduct operations in such a manner as to meet or exceed all Environmental Laws in its business activities. The Company will routinely review the conduct of its operations in an effort to strive for continuous improvement in its environmental performance.

## ENVIRONMENT, HEALTH, AND SAFETY COMMITTEE CHARTER

124.    The Environment, Health, Safety Committee's purpose is to "provide assistance to the Board of Directors in providing oversight and support of the Company's policies, programs and initiatives on the environment, health and safety."

125.    The responsibilities and duties of the Committee's charter are as follows:

> 3. Reviewing and providing input to management and the Board of Directors regarding the Company's compliance with laws, regulations, policies, programs and practices with regard to environmental, health and safety matters by, among other things, receiving and reviewing with management reports regarding:
> > a.  the Company's management of and responses to releases, investigations, notices of violations, remediations, civil action or other occurrences

involving environmental laws or regulations;

   b. the Company's safety program, including reports of incidents, statistics and actions or investigations by any governmental body, as well as the Company's response to the same;

   c. the Company's management of and responses to pending legislative and regulatory efforts in the environmental, health and safety and areas likely to significantly affect the Company's business;

   d. environmental, health and safety matters relating to the Company's projects and operations and initiatives and training designed to improve the Company's performance with regard to such matters; and

   e. the Company's efforts to gather data and communicate externally regarding its environmental, health and safety sustainability programs, initiatives and outcomes.

4. Consulting with the Board of Directors and internal and external advisers of the Company, as appropriate, regarding the management of the Company's health, safety and environmental programs, trends in environmental compliance and the economic effect of such trends on the Company's business.

5. Overseeing and reviewing all external disclosures regarding the Company's environmental, health and safety sustainability data, programs, initiatives and outcomes and providing insight and recommendations to the Board of Directors on such matters.

6. Conducting an annual performance evaluation of the Committee.

7. Reviewing the Committee charter annually and making recommendations to the Board of Directors for revisions, as appropriate.

8. Reporting its actions and any recommendations to the Board of Directors after each Committee meeting.

## AUDIT COMMITTEE CHARTER

126.    The Audit Committee is responsible for overseeing "(1) the integrity of the financial statements of the Company, (2) the compliance by the Company with legal and regulatory requirements, (3) the independence qualifications and performance of the Company's independent auditors and (4) the performance of the Company's internal audit function."

127.    Some of the responsibilities and duties of the Committee's charter are as follows:

2. Overseeing and providing recommendations to the Board of Directors regarding the Company's climate change and sustainability policies and programs, including the Company's commitment to minimizing its impact on the environment and protecting the health and safety of its workers and the communities in which it operates, as well as overseeing and providing recommendations on the reporting and public disclosure thereon.
          *      *      *

31

4. Prepare and approve the audit committee report required to be included in the Company's proxy statement for the annual meeting (or in the Company's Annual Report on Form 10-K if required to be included therein).

5. Review and discuss with management and the independent auditors the Company's quarterly financial statements, as well as disclosures made in management's discussion and analysis of financial condition and results of operations, including any matters provided in Statement on Auditing Standards No. 100 (significant events during auditor's quarterly review, such as a material change in accounting principles, a significant subsequent event or significant accounting adjustments) arising in connection with the Company's quarterly financial statements prior to the filing of the Company's Quarterly Report on Form 10-Q.

*        *        *

11. Meet periodically with management and the internal auditors to review the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures; and discuss the Company's policies and guidelines concerning financial risk assessment and financial risk management.

*        *        *

24. Obtain reports from management and advise the Board of Directors with respect to the Company's compliance with applicable laws and regulations as contained in the Company's Code of Business Conduct, including compliance by the Company's subsidiaries and foreign affiliated entities; and oversee the review of any issues raised with respect to these matters by management, internal auditing, the independent auditors or employees.

*        *        *

27. Review with the Company's Legal Counsel legal matters that may have a material impact on the Company's financial statements, the Company's compliance policies and any material reports or inquiries received from regulators or governmental agencies.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

128.    Cabot purports to be an independent oil and gas company involved in the development, exploitation and exploration of oil and gas in the United States. Cabot is primarily focused on the Marcellus Shale in Susquehanna County, Pennsylvania.

129.    Cabot has a decade long history of environmental violations in Pennsylvania,

despite the Company's repeated denials. This is not the Company's first incident with faulty gas wells that resulted in stray gas migration and the pollution of drinking water. In 2009, fifteen families from Dimock, Pennsylvania filed a federal lawsuit against the Company alleging that Cabot had contaminated their drinking water supply. On December 15, 2010, PaDEP and Cabot entered into a Consent Order and Settlement Agreement after finding concluded that faulty gas wells polluted the drinking water supplies of nineteen homes in the area.

**False and Misleading Statements**

*October 23, 2015 10-Q*

130.    On October 23, 2015, Cabot filed its quarterly report with the SEC on Form 10-Q for the quarterly period ended September 30, 2015 (the "3Q15 10-Q"), which was signed by Defendants Dinges and Schroeder, and nonparty Todd M. Roemer.

131.    The 3Q15 10-Q described the Company's potential exposure with respect to environmental matters, in relevant part, as follows:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

132.    Attached to the 3Q15 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Dinges and Schroeder, attesting to the accuracy of the 3Q15 10-Q.

*February 22, 2016 10-K*

133.    On February 22, 2016, the Company filed the 2015 10-K with the SEC. The 2015 10-K was signed by Defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls, and

nonparties Todd M. Roemer and Robert Keiser. The 2015 10-K maintained that Cabot

"substantially compl[ies] with the Clean Water Act and related federal and state regulations."

134.    The 2015 10-K described the Company's environmental matters as follows:

> On November 12, 2015, we received a proposed Consent Order and Agreement
> from the Pennsylvania Department of Environmental Protection (PaDEP) relating
> to gas migration allegations in an area surrounding several wells owned and
> operated by us in Susquehanna County, Pennsylvania. The allegations relating to
> these wells were initially raised by residents in the area in August 2011. We
> received a Notice of Violation from the PaDEP in September 2011 for failure to
> prevent the migration of gas into fresh groundwater sources in the area surrounding
> these wells. Since then, we have been engaged with the PaDEP in investigating the
> incident and have performed appropriate remediation efforts, including the
> provision of alternative sources of drinking water to affected residents. ***We believe
> the source of methane has been remediated and are working with the PaDEP to
> reach agreement on the disposition of this matter.*** The proposed Consent Order
> and Agreement is the culmination of this effort and, if finalized, would result in the
> payment of a civil monetary penalty in an amount likely to exceed $100,000, up to
> approximately $300,000. We will continue to work with the PaDEP to finalize the
> Consent Order and Agreement and bring this matter to a close.
>
> From time to time we receive notices of violation from governmental and
> regulatory authorities in areas in which we operate relating to alleged violations of
> environmental statutes or the rules and regulations promulgated thereunder. While
> we cannot predict with certainty whether these notices of violation will result in
> fines and/or penalties, if fines and/or penalties are imposed, they may result in
> monetary sanctions, individually or in the aggregate, in excess of $100,000.

(Emphasis added.)

135.    The 2015 10-K in a section titled, "Environmental and Safety Regulations," the

report includes a non-specific boilerplate provision that states:

> Our operations are subject to extensive federal, state and local laws and regulations
> relating to the generation, storage, handling, emission, transportation and discharge
> of materials into the environment. Permits are required for the operation of our
> various facilities. These permits can be revoked, modified or renewed by issuing
> authorities. Governmental authorities enforce compliance with their regulations
> through fines, injunctions or both. Government regulations can increase the cost of
> planning, designing, installing and operating, and can affect the timing of installing
> and operating, oil and natural gas facilities. Although we believe that compliance
> with environmental regulations will not have a material adverse effect on us, risks
> of substantial costs and liabilities related to environmental compliance issues are

part of oil and natural gas production operations. No assurance can be given that significant costs and liabilities will not be incurred. Also, it is possible that other developments, such as stricter environmental laws and regulations, and claims for damages to property or persons resulting from oil and natural gas production could result in substantial costs and liabilities to us.

136.    Attached to the 2015 10-K were SOX certifications signed by Defendants Dinges and Schroeder, attesting to the accuracy of the 2015 10-K.

### *May 3, 2016 10-Q*

137.    On May 3, 2016, Cabot filed its quarterly report with the SEC on Form 10-Q for the quarterly period ended March 31, 2016 (the "1Q16 10-Q"), which was signed by Defendants Dinges and Schroeder, and nonparties Todd M. Roemer.

138.    The 1Q16 10-Q described the Company's environmental matters as follows:

On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. ***We believe the source of methane has been remediated and are working with the PaDEP to reach agreement on the disposition of this matter.*** The proposed Consent Order and Agreement is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $300,000. We will continue to work with the PaDEP to finalize the Consent Order and Agreement and bring this matter to a close.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

(Emphasis added.)

139.    Attached to the 1Q16 10-Q were SOX certifications signed by Defendants Dinges and Schroeder, attesting to the accuracy of the 1Q16 10-Q.

### July 29, 2016 10-Q

140.    On July 29, 2016, the Company filed its quarterly report with the SEC on Form 10-Q for the quarterly period ended June 30, 2016 (the "2Q16 10-Q"), which was signed by Defendants Dinges and Schroeder, and nonparties Todd M. Roemer.

141.    The 2Q16 10-Q described the Company's environmental matters as follows:

On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. ***We believe the source of methane has been remediated and are working with the PaDEP to reach agreement on the disposition of this matter.*** The proposed Consent Order and Agreement is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $300,000. We will continue to work with the PaDEP to finalize the Consent Order and Agreement and bring this matter to a close.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

(Emphasis added.)

142.    Attached to the 2Q16 10-Q were SOX certifications signed by Defendants Dinges and Schroeder, attesting to the accuracy of the 2Q16 10-Q.

***October 28, 2016 10-Q***

143.    On October 28, 2016, the Company filed its quarterly report with the SEC on Form

10-Q for the quarterly period ended September 30, 2016 (the "3Q16 10-Q"), which was signed by

Defendants Dinges and Schroeder, and nonparty Todd M. Roemer.

144.    The 3Q16 10-Q described the Company's environmental matters as follows:

On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. ***We believe the source of methane has been remediated and are working with the PaDEP to reach agreement on the disposition of this matter.*** The proposed Consent Order and Agreement is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $300,000. We will continue to work with the PaDEP to finalize the Consent Order and Agreement and bring this matter to a close.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

(Emphasis added.)

145.    Attached to the 3Q16 10-Q were SOX certifications signed by Defendants Dinges

and Schroeder, attesting to the accuracy of the 3Q16 10-Q.

*February 27, 2017 10-K*

146.    On February 27, 2017, the Company filed the 2016 10-K with the SEC, which was signed by Defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls, and nonparty Todd M. Roemer. The 2016 10-K maintained that Cabot "substantially compl[ies] with the Clean Water Act and related federal and state regulations." The 2016 10-K also contained substantially similar boilerplate risk provisions to those set forth in the 2015 10-K.

147.    The 2016 10-K described the Company's environmental matters as follows:

On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. ***We believe the source of methane has been remediated and we entered into a Consent Order and Agreement with the PaDEP on December 30, 2016. We agreed to pay a civil monetary penalty in the amount of approximately $0.3 million and to continue to provide alternative sources of drinking water to affected residents until the affected water supplies are permanently restored.*** Further, the related gas well is being permanently plugged. Following the plugging of the gas well, additional monitoring will be required to ensure the source of methane has been remediated. Cabot continues to work with the PaDEP to bring this matter to a close.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

(Emphasis added.)

148.    Attached to the 2016 10-K were SOX certifications signed by Defendants Dinges and Schroeder, attesting to the accuracy of the 2016 10-K.

*April 28, 2017 10-Q*

149.    On April 28, 2017, the Company filed its quarterly report with the SEC on Form 10-Q for the quarterly period ended March 31, 2017 (the "1Q17 10-Q"), which was signed by Defendants Dinges and Schroeder, and nonparty Todd M. Roemer.

150.    The 1Q17 10-Q described the Company's environmental matters as follows:

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

151.    Attached to the 1Q17 10-Q were SOX certifications signed by Defendants Dinges and Schroeder, attesting to the accuracy of the 1Q17 10-Q.

*July 28, 2017 10-Q*

152.    On July 28, 2017, the Company filed its quarterly report with the SEC on Form 10-Q for the quarterly period ended June 30, 2017 (the "2Q17 10-Q"), which was signed by Defendants Dinges and Schroeder, and nonparty Todd M. Roemer.

153.    The 2Q17 10-Q described the Company's environmental matters as follows:

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

154.    Attached to the 2Q17 10-Q were SOX certifications signed by Defendants Dinges and Schroeder, attesting to the accuracy of the 2Q17 10-Q.

### October 30, 2017 10-Q

155.    On October 30, 2017, the Company filed its quarterly report with the SEC on Form 10-Q for the quarterly period ended September 30, 2017 (the "3Q17 10-Q"), which was signed by Defendants Dinges and Schroeder, and nonparty Todd M. Roemer.

156.    The 3Q17 10-Q described the Company's environmental matters as follows:

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

157.    Attached to the 3Q17 10-Q were SOX certifications signed by Defendants Dinges and Schroeder, attesting to the accuracy of the 3Q17 10-Q.

### March 1, 2018 10-K

158.    On March 1, 2018, the Company filed its annual report with the SEC on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"), which was signed by Defendants Dinges, Schroeder, Ables, Best, Boswell, Brock, Kelley, Ralls, and Watts, and nonparty Todd M. Roemer. The 2017 10-K maintained that Cabot "substantially compl[ies] with the Clean Water Act and related federal and state regulations." The 2017 10-K also contained substantially similar boilerplate risk provisions to those set forth in the 2015 10-K.

159.    The 2017 10-K described the Company's environmental matters as follows:

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

160.    Attached to the 2017 10-K were SOX certifications signed by Defendants Dinges

and Schroeder, attesting to the accuracy of the 2017 10-K.

### March 22, 2018 Proxy Statement

161.    On March 22, 2018, the Company filed the 2018 Proxy Statement with the SEC. Defendants Ables, Best, Boswell, Brock, Dinges, Kelley, Ralls, and Watts solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

162.    With respect to the Company's Code of Business Conduct, the 2018 Proxy Statement stated, "[a]ll employees, officers and directors are required to comply with the Company's Code of Business Conduct to help ensure that the Company's business is conducted in accordance with the highest standards of moral and ethical behavior." The 2018 Proxy Statement further stated, "[t]he Code of Business Conduct covers all areas of professional conduct, including conflicts of interest, customer relationships, insider trading, financial disclosure, intellectual property and confidential information, as well as requiring strict adherence to all laws and regulations applicable to the Company's business."

163.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Business Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, including the potential civil and/or criminal liabilities for Cabot's continued failure to fix the faulty gas well in Pennsylvania despite assurances that it would be resolved, the insider trading engaged in by one of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Business Conduct.

164.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "performance-based pay" elements, including linking incentive award opportunities "[t]o encourage management

to create sustained value for the shareholders while managing inherent business risks[,]" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein. On the contrary, the 2018 Proxy Statement maintained that the Company's performance outcomes in 2017 were overall successful by highlighting a list of accomplishments such as "[r]epurchasing slightly over five million shares ($123.7 million) of our Common Stock during the year, further improving our growth metrics on a per share basis."

165.    In breach of their fiduciary duties during the Relevant Period, the Individual Defendants made and/or caused the Company to make a series of materially false and/or misleading statements and omissions regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants improperly failed to disclose in the 2018 Proxy Statement, *inter alia*, that: (1) Cabot's environmental controls and procedures with regard to gas wells in Susquehanna County, Pennsylvania were inadequate, as they continuously failed to fix the ongoing stray gas migration in the area; (2) as a result, Pennsylvania's water supplies was polluted and endangering its citizens; (3) consequently, the Company was exposed to heightened governmental scrutiny—despite assurances minimizing the Company's potential environmental liabilities; (4) Cabot faced potential civil and/or criminal liabilities for its failure to fix the faulty gas wells; (5) these issues would foreseeably impact the Company's reputation and financial projections; and (6) Cabot would be incapable of achieving its growth projections. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### April 27, 2018 10-Q

166.    On April 27, 2018, the Company filed its quarterly report with the SEC on Form 10-Q for the quarterly period ended March 31, 2018 on a Form 10-Q (the "1Q18 10-Q"), which was signed by Defendants Dinges and Schroeder, and nonparty Todd M. Roemer.

167.    The 1Q18 10-Q described the Company's environmental matters as follows:

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

168.    Attached to the 1Q18 10-Q were SOX certifications signed by Defendants Dinges and Schroeder, attesting to the accuracy of the 1Q18 10-Q.

### July 27, 2018 10-Q

169.    On July 27, 2018, the Company filed its quarterly report with the SEC on Form 10-Q for the quarterly period ended June 30, 2018 (the "2Q18 10-Q"), which was signed by Defendants Dinges and Schroeder, and nonparty Todd M. Roemer.

170.    The 2Q18 10-Q described the Company's environmental matters as follows:

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

171.    Attached to the 2Q18 10-Q were SOX certifications signed by Defendants Dinges and Schroeder, attesting to the accuracy of the 2Q18 10-Q.

### *October 26, 2018 10-Q*

172.    On October 26, 2018, the Company filed its quarterly report with the SEC on Form 10-Q for the quarterly period ended September 30, 2018 (the "3Q18 10-Q"), which was signed by Defendants Dinges and Schroeder, and nonparty Todd M. Roemer.

173.    The 3Q18 10-Q described the Company's environmental matters as follows:

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

174.    Attached to the 3Q18 10-Q were SOX certifications signed by Defendants Dinges and Schroeder, attesting to the accuracy of the 3Q18 10-Q.

### *February 26, 2019 10-K*

175.    On February 26, 2019, the Company filed its annual report with the SEC for the fiscal year ended December 31, 2018 (the "2018 10-K"), which was signed by Defendants Dinges, Schroeder, Ables, Best, Boswell, Brock, Delaney, Kelley, Ralls, and Watts, and nonparty Todd M. Roemer. The 2018 10-K also contained substantially similar boilerplate risk provisions to those set forth in the 2015 10-K.

176.    The 2018 10-K described the Company's environmental matters as follows:

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

177.    Attached to the 2018 10-K were SOX certifications signed by Defendants Dinges and Schroeder, attesting to the accuracy of the 2018 10-K.

### March 19, 2019 Proxy Statement

178.     On March 19, 2019, the Company filed the 2019 Proxy Statement with the SEC. Defendants Ables, Best, Boswell, Brock, Delaney, Dinges, Kelley, Ralls, and Watts solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

179.     With respect to the Company's Code of Business Conduct, the 2019 Proxy Statement stated, "[a]ll employees, officers and directors are required to comply with the Company's Code of Business Conduct to help ensure that the Company's business is conducted in accordance with the highest standards of moral and ethical behavior." The 2019 Proxy Statement further stated, "[t]he Code of Business Conduct covers all areas of professional conduct, including conflicts of interest, customer relationships, insider trading, financial disclosure, intellectual property and confidential information, as well as requiring strict adherence to all laws and regulations applicable to the Company's business."

180.     The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Business Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, including the potential civil and/or criminal liabilities for its continued failure to fix the faulty gas well in Pennsylvania despite assurances that it would be resolved, and the Individual Defendants' failures to report violations of the Code of Business Conduct.

181.     The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "performance-based pay" elements, including linking incentive award opportunities "[t]o encourage management to create sustained value for the shareholders while managing inherent business risks[,]" while

failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein. On the contrary, the 2019 Proxy Statement maintained that the Company's performance outcomes in 2018 were overall successful by highlighting a list of accomplishments such as "[g]enerated free cash flow for the third consecutive year with 2018 free cash flow of $296.6 million, which is more than the previous two years combined."

182.    In breach of their fiduciary duties during the Relevant Period, the Individual Defendants made and/or caused the Company to make a series of materially false and/or misleading statements and omissions regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Cabot's environmental controls and procedures with regard to gas wells in Susquehanna County, Pennsylvania were inadequate, as they continuously failed to fix the ongoing stray gas migration in the area; (2) as a result, Pennsylvania's water supplies was polluted and endangering its citizens; (3) consequently, the Company was exposed to heightened governmental scrutiny— despite assurances minimizing the Company's potential environmental liabilities; (4) Cabot faced potential civil and/or criminal liabilities for its failure to fix the faulty gas wells; (5) these issues would foreseeably impact the Company's reputation and financial projections; and (6) Cabot would be incapable of achieving its growth projections. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *April 26, 2019 10-Q*

183.    On April 26, 2019, the Company filed its quarterly report with the SEC on Form 10-Q for the quarterly period ended March 31, 2019 (the "1Q19 10-Q"), which was signed by Defendants Dinges and Schroeder, and nonparty Todd M. Roemer.

184.    The 1Q19 10-Q described the Company's environmental matters as follows:

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

185.    Attached to the 1Q19 10-Q were SOX certifications signed by Defendants Dinges and Schroeder, attesting to the accuracy of the 1Q19 10-Q.

186.    The statements in ¶¶130-160, ¶¶ 166-177, and ¶¶ 183-185 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Cabot's environmental controls and procedures with regard to gas wells in Susquehanna County, Pennsylvania were inadequate, as they continuously failed to fix the ongoing stray gas migration in the area; (2) as a result, Pennsylvania's water supplies was polluted and endangering its citizens; (3) consequently, the Company was exposed to heightened governmental scrutiny—despite assurances minimizing the Company's potential environmental  liabilities; (4) Cabot faced potential civil and/or criminal liabilities for its failure to fix the faulty gas wells; (5) these issues would foreseeably impact the Company's reputation and financial projections; and (6) Cabot would be incapable of achieving its growth projections. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge while False and Misleading Statements Continue

#### *July 26, 2019 10-Q*

187.    On July 26, 2019, Cabot filed the 2Q19 10-Q with the SEC. The 2Q19 10-Q was signed by Defendants Dinges and Schroeder, and nonparty Todd M. Roemer.

188.    The 2Q19 10-Q described the Company's environmental matters as follows:

On June 17, 2019, we received two proposed Consent Order and Agreements ("CO&A") from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. *The allegations relating to these wells were initially raised by residents in the area in March and June 2017, respectively, in the form of complaints about their drinking water supply. Since then, we have been engaged with the PaDEP in investigating the incidents and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the affected residents. We received Notices of Violation ("NOV") from the PaDEP in June and November, 2017, respectively, for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells.* With regard to the June 2017 NOV, we believe these water quality complaints have been resolved, and we are working with the PaDEP to reach agreement on the disposition of this matter. The proposed CO&A is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $215,000. We will continue to work with the PaDEP to finalize the CO&A, and to bring this matter to a close. With regard to the November 2017 NOV, The proposed CO&A, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PaDEP to finalize the CO&A, and to complete the ongoing investigation and remediation.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

(Emphasis added.)

189.    On this news, Cabot's share price dropped $2.63 (over 12%) from closing at $21.79 per share on July 25, 2020, to close at $19.16 per share on July 26, 2019.

190.    Attached to the 2Q19 10-Q were SOX certifications signed by Defendants Dinges and Schroeder, attesting to the accuracy of the 2Q19 10-Q.

***October 25, 2019 10-Q***

191.     On October 25, 2019, the Company filed its quarterly report with the SEC on Form

10-Q for the quarterly period ended September 30, 2019 (the "3Q19 10-Q"), which was signed by

Defendants Dinges and Schroeder, and nonparty Todd M. Roemer.

192.     The 3Q19 10-Q described the Company's environmental matters as follows:

On June 17, 2019, we received two proposed Consent Order and Agreements
("CO&A") from the Pennsylvania Department of Environmental Protection
(PaDEP) relating to gas migration allegations in areas surrounding several wells
owned and operated by us in Susquehanna County, Pennsylvania. The allegations
relating to these wells were initially raised by residents in the area in March and
June 2017, respectively, in the form of complaints about their drinking water
supply. Since then, we have been engaged with the PaDEP in investigating the
incidents and have performed appropriate remediation efforts, including the
provision of alternative sources of drinking water to the affected residents. We
received Notices of Violation ("NOV") from the PaDEP in June and November,
2017, respectively, for failure to prevent the migration of gas into fresh
groundwater sources in the area surrounding these wells.  With regard to the June
2017 NOV, we believe these water quality complaints have been resolved, and we
are working with the PaDEP to reach agreement on the disposition of this
matter. The proposed CO&A is the culmination of this effort and, if finalized,
would result in the payment of a civil monetary penalty in an amount likely to
exceed $100,000, up to approximately $215,000. We will continue to work with
the PaDEP to finalize the CO&A, and to bring this matter to a close. With regard
to the November 2017 NOV, The proposed CO&A, if finalized as drafted, would
require Cabot to submit a detailed written remediation plan, continue water
sampling and other investigative measures and restore or replace affected water
supplies and would result in the payment of a civil monetary penalty in an amount
likely to exceed $100,000, up to approximately $355,000. We will continue to work
with the PaDEP to finalize the CO&A, and to complete the ongoing investigation
and remediation.

From time to time we receive notices of violation from governmental and
regulatory authorities in areas in which we operate relating to alleged violations of
environmental statutes or the rules and regulations promulgated thereunder. While
we cannot predict with certainty whether these notices of violation will result in
fines and/or penalties, if fines and/or penalties are imposed, they may result in
monetary sanctions, individually or in the aggregate, in excess of $100,000.

193.    Attached to the 3Q19 10-Q were SOX certifications signed by Defendants Dinges and Schroeder, attesting to the accuracy of the 3Q19 10-Q.

***February 25, 2020 10-K***

194.    On February 25, 2020, the Company filed its annual report filed its annual report with the SEC for the fiscal year ended December 31, 2019 (the "2019 10-K"), which was signed by Defendants Dinges, Schroeder, Ables, Best, Boswell, Brock, Delaney, Kelley, Ralls, and Watts, and nonparty Todd M. Roemer. The 2019 10-K also contained substantially similar boilerplate risk provisions to those set forth in the 2015 10-K.

195.    The 2019 10-K described the Company's environmental matters as follows:

On June 17, 2019, we received two proposed Consent Order and Agreements (CO&A) from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in March and June 2017, respectively, in the form of complaints about their drinking water supply. Since then, we have been engaged with the PaDEP in investigating the incidents and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the affected residents. We received Notices of Violation (NOV) from the PaDEP in June and November, 2017, respectively, for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. With regard to the June 2017 NOV, we believe these water quality complaints have been resolved, and we are working with the PaDEP to reach agreement on the disposition of this matter. The proposed CO&A is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $215,000. We will continue to work with the PaDEP to finalize the CO&A, and to bring this matter to a close. With regard to the November 2017 NOV, the proposed CO&A, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PaDEP to finalize the CO&A, and to complete the ongoing investigation and remediation.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While

we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

196.    Attached to the 2019 10-K were SOX certifications signed by Defendants Dinges and Schroeder, attesting to the accuracy of the 2019 10-K.

### March 17, 2020 Proxy Statement

197.    On March 17, 2020, the Company filed the 2020 Proxy Statement with the SEC. Defendants Ables, Best, Boswell, Brock, Delaney, Dinges, Kelley, Ralls, and Watts solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

198.    With respect to the Company's Code of Business Conduct, the 2020 Proxy Statement stated, "[a]ll employees, officers and directors are required to comply with the Company's Code of Business Conduct to help ensure that the Company's business is conducted in accordance with the highest standards of moral and ethical behavior." The 2020 Proxy Statement further stated, "[t]he Code of Business Conduct covers all areas of professional conduct, including conflicts of interest, customer relationships, insider trading, financial disclosure, intellectual property and confidential information, as well as requiring strict adherence to all laws and regulations applicable to the Company's business."

199.    The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Business Conduct were not followed, as evidenced by the numerous false and misleading statements alleged herein, including the potential civil and/or criminal liabilities for its continued failure to fix the faulty gas well in Pennsylvania despite assurances that it would be resolved, and the Individual Defendants' failures to report violations of the Code of Business Conduct.

200.    The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "performance-based pay" elements, including linking incentive award opportunities "[t]o encourage management to create sustained value for the shareholders while managing inherent business risks[,]" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein. On the contrary, the 2020 Proxy Statement maintained that the Company's performance outcomes in 2019 were overall successful by highlighting a list of accomplishments such as "[g]enerated free cash flow for the fourth consecutive year with 2019 free cash flow of $563.1 million."

201.    In breach of their fiduciary duties during the Relevant Period, the Individual Defendants made and/or caused the Company to make a series of materially false and/or misleading statements and omissions regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Cabot's environmental controls and procedures with regard to gas wells in Susquehanna County, Pennsylvania were inadequate, as they continuously failed to fix the ongoing stray gas migration in the area; (2) as a result, Pennsylvania's water supplies was polluted and endangering its citizens; (3) consequently, the Company was exposed to heightened governmental scrutiny—despite assurances minimizing the Company's potential environmental liabilities; (4) Cabot faced potential criminal liabilities for its failure to fix the faulty gas wells; (5) these issues would foreseeably impact the Company's reputation and financial projections; and (6) Cabot would be incapable of achieving its growth projections. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

202.    On March 3, 2020, during an interview with the *Pittsburgh Post-Gazette*, Pennsylvania Attorney General, Josh Shapiro, revealed that "he is expending significant investigative resources in pursuit of more than a dozen criminal cases involving the shale gas industry" and anticipates "crimes charges in the near future." The investigation was revealed to be primarily focused on operations located in the Marcellus Shale fields of Pennsylvania.

203.    The statements in ¶¶ 187-196 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Cabot's environmental controls and procedures with regard to gas wells in Susquehanna County, Pennsylvania were inadequate, as they continuously failed to fix the ongoing stray gas migration in the area; (2) as a result, Pennsylvania's water supplies was polluted and endangering its citizens; (3) consequently, the Company was exposed to heightened governmental scrutiny—despite assurances minimizing the Company's potential environmental  liabilities; (4) Cabot faced potential criminal liabilities for its failure to fix the faulty gas wells; (5) these issues would foreseeably impact the Company's reputation and financial projections; and (6) Cabot would be incapable of achieving its growth projections. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

204.    On June 15, 2020, Cabot was charged by the Pennsylvania Attorney General's office with 15 criminal counts, including eight felonies, following a two-year state grand jury investigation into environmental crimes committed by shale gas companies across the State of Pennsylvania. The grand jury investigation found that "the company has failed to fix faulty gas wells that are leaking methane into residential water supplies in Dimock and surrounding

communities." As reported by *The Seattle Times:*

> "We find that, over a period of many years, and despite mounting evidence, Cabot Oil & Gas failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration," the grand jury wrote, criticizing Cabot's "long-term indifference to the damage it caused to the environment and citizens of Susquehanna County."

> The Pennsylvania attorney general's office charged Cabot with a total of 15 criminal counts, including illegal discharge of industrial wastes and unlawful conduct under the state's Clean Streams Law. Maximum fines are $50,000 or $25,000, depending on the count.

> "Cabot took shortcuts that broke the law, damaged our environment, harming our water supplies and endangering Pennsylvanians. They put their bottom line ahead of the health and safety of our neighbors," Attorney General Josh Shapiro said in a video statement.

205.    On this news, Cabot's share price dropped $0.67 (over 3.3%) from closing at $20.07 per share on June 12, 2020, to close at $19.40 per share on June 15, 2020.

206.    The Pennsylvania Attorney General's criminal action remains ongoing. The Company's most recently filed quarterly report with the SEC on Form 10-Q for the quarterly period ended September 30, 2020, mentioned the ongoing criminal action against the Company as follows:

> In June 2020, the Office of Attorney General of the Commonwealth of Pennsylvania informed the Company that it will pursue certain misdemeanor and felony charges against the Company related to alleged violations of the Pennsylvania Clean Streams Law, which prohibits discharge of industrial wastes. The Company is vigorously defending itself against such charges; however, the proceedings could result in fines or penalties against the Company. At this time, it is not possible to estimate the amount of any fines or penalties, or the range of such fines or penalties, that are reasonably possible in this case.

### Repurchases During the Relevant Period

207.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $1.15 billion to repurchase approximately 48.6

million shares of its own common stock at artificially inflated prices from May 2017 through June 2019.

208.    As the Company's stock was actually worth only $19.40 per share, the price at closing on June 15, 2020, the Company overpaid approximately $209 million in total for these repurchases.

209.    According to the 2Q17 10-Q, during the month of May 2017, the Company purchased 750,000 shares of its common stock for approximately $17 million at an average price of $22.65 per share.

210.    According to the 2Q17 10-Q, during the month of June 2017, the Company purchased 2,293,246 million shares of its common stock for approximately $51 million at an average price of $22.33 per share.

211.    As the Company's stock was actually worth only $19.40 per share, the price at closing on June 15, 2020, the amount the Company overpaid for repurchases of its own stock during May and June 2017 was approximately $9.1 million.

212.    According to the 2017 10-K, during the month of November 2017, the Company purchased 177,900 shares of its common stock for approximately $4.9 million, at an average price of $27.81 per share.

213.    According to the 2017 10-K, during the month of December 2017, the Company purchased 1,822,100 shares of its common stock for approximately $50.5 million, at an average price of $27.71 per share.

214.    As the Company's stock was actually worth only $19.40 per share, the price at closing on June 15, 2020, the amount the Company overpaid for repurchases of its own stock during November and December 2017 was approximately $16.6 million.

215.    According to the 1Q18 10-Q, during the month of March 2018, the Company purchased 8,327,781 shares of its common stock for approximately $206.9 million, at an average price of $24.85 per share.

216.    As the Company's stock was actually worth only $19.40 per share, the price at closing on June 15, 2020, the amount the Company overpaid for repurchases of its own stock during March 2018 was approximately $45.4 million.

217.    According to the 2Q18 10-Q, during the month of April 2018, the Company purchased 1,645,998 shares of its common stock for approximately over $38.5 million, at an average price of $23.40 per share.

218.    According to the 2Q18 10-Q, during the month of June 2018, the Company purchased 10,000,000 shares of its common stock for approximately $235.6 million, at an average price of $23.56 per share.

219.    As the Company's stock was actually worth only $19.40 per share, the price at closing on June 15, 2020, the amount the Company overpaid for repurchases of its own stock during April and June 2018 was approximately $48.2 million.

220.    According to the 3Q18 10-Q, during the month of August 2018, the Company purchased 39,037 shares of its common stock for approximately $892,776, at an average price of $22.87 per share.

221.    According to the 3Q18 10-Q, during the month of September 2018, the Company purchased 7,131,508 shares of its common stock for approximately over $161.7 million, at an average price of $22.67 per share.

222.    As the Company's stock was actually worth only $19.40 per share, the price at closing on June 15, 2020, the amount the Company overpaid for repurchases of its own stock during August and September 2018 was approximately $23.4 million.

223.    According to the 2018 10-K, during the month of October 2018, the Company purchased 2,829,455 shares of its common stock for approximately $65.5 million, at an average price of $23.17 per share.

224.    According to the 2018 10-K, during the month of December 2018, the Company purchased 8,500,000 shares of its common stock for approximately $194.1 million, at an average price of $22.84 per share.

225.    As the Company's stock was actually worth only $19.40 per share, the price at closing on June 15, 2020, the amount the Company overpaid for repurchases of its own stock during October and December 2018 was approximately $40 million.

226.    According to the 2Q19 10-Q, during the month of April 2019, the Company purchased 80,933 shares of its common stock for approximately $2 million, at an average price of $25.47 per share.

227.    According to the 2Q19 10-Q, during the month of May 2019, the Company purchased 2,250,000 shares of its common stock for approximately $57.2 million, at an average price of $25.44 per share.

228.    According to the 2Q19 10-Q, during the month of June 2019, the Company purchased 2,750,000 shares of its common stock for approximately $65.8 million, at an average price of $23.95 per share.

229.    As the Company's stock was actually worth only $19.40 per share, the price at closing on June 15, 2020, the amount the Company overpaid for repurchases of its own stock during April, May, and June 2019 was approximately over $26.6 million.

230.    Thus, in total, during the Relevant Period between May 2017 to June 2019, the Company overpaid for repurchases of its own stock by approximately over $209 million.

## DAMAGES TO CABOT

231.    As a direct and proximate result of the Individual Defendants' conduct, Cabot has lost and expended, and will lose and expend, many millions of dollars.

232.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of its current officers, any internal investigations, the civil and/or criminal monetary penalties for charges brought by the Pennsylvania Attorney General's office and/or violation of environmental regulations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

233.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

234.    Such losses include the Company's overpayment by approximately $209 million for repurchases of its own stock during the Relevant Period, during which the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

235.    As a direct and proximate result of the Individual Defendants' conduct, Cabot has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

236.    Plaintiff brings this action derivatively and for the benefit of Cabot to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Cabot, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, as well as the aiding and abetting thereof.

237.    Cabot is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

238.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Cabot. Plaintiff will adequately and fairly represent the interests of Cabot in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

239.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

240.    A pre-suit demand on the Board of Cabot is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Dinges, Ables, Best, Boswell, Brock, Delaney, Kelley, Ralls, and Watts (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the nine Director-Defendants.

241.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact while one of them engaged in insider sales

based on material non-public information, and, at the same time, to cause the Company to overpay by approximately over $209 million for repurchases of its own stock, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

242.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

243.    Additional reasons that demand on Defendant Dinges is futile follow. Defendant Dinges has served as the Chairman of the Board, President and CEO since May 2002. Thus, he is a non-independent director. The Company provides Defendant Dinges with his principal occupation, and he receives handsome compensation as described above, including $13,830,926 during the fiscal year ended December 31, 2019. Defendant Dinges was ultimately responsible for all of the false and misleading statements and omissions made in the quarterly and annual reports alleged herein, which he signed and/or signed SOX certifications for. As the Company's highest officer and as a trusted director, Defendant Dinges conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Dinges is a defendant in the Securities Class Action. Additionally, during the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant

Dinges sold 66,610 Company shares on inside information, for which he received approximately over $1.8 million. Thus, for these reasons, too, Defendant Dinges breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

244.    Additional reasons that demand on Defendant Ables is futile follow. Defendant Ables has served as a director of the Company since 2015. She also serves as the Chairman of the Audit Committee and as a member of the Compensation Committee. Defendant Ables has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director and Chairman of the Audit Committee, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Ables signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, too, Defendant Ables breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

245.    Additional reasons that demand on Defendant Best is futile follow. Defendant Best has served as a director of the Company since 2008. He also serves as the Chairman of the Compensation Committee and as a member of the Governance and Social Responsibility Committee. Defendant Best has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, Chairman of the Compensation Committee, and as a member of the Governance and Social Responsibility Committee, he conducted little, if any, oversight of the scheme to make false and misleading statements,

consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Best signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, too, Defendant Best breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

246.    Additional reasons that demand on Defendant Boswell is futile follow. Defendant Boswell has served as a director of the Company since 2015. He serves as the Chairman of the Environment, Health and Safety Committee. He also serves as a member of the Audit and Governance and Social Responsibility Committees. Defendant Boswell has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, Chairman of the Environment, Health and Safety Committee and member of the Audit and Governance and Social Responsibility Committees, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Boswell signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, too, Defendant Boswell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

247.    Additional reasons that demand on Defendant Brock is futile follow. Defendant Brock has served as a director of the Company since 2017 and is a member of the Audit and Environment, Health and Safety Committees. Defendant Brock has received and continues to

receive compensation for her role as a director as described herein. As a trusted Company director and member of the Audit and Environment, Health and Safety Committees, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Brock signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, too, Defendant Brock breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

248.    Additional reasons that demand on Defendant Delaney is futile follow. Defendant Delaney has served as a director of the Company since 2018 and is a member of the Audit and Environment, Health and Safety Committees. Defendant Delaney has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director and member of the Audit and Environment, Health and Safety Committees, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Delaney signed, and thus personally made the false and misleading statements in the 2018 10-K and 2019 10-K. For these reasons, too, Defendant Delaney breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

249.    Additional reasons that demand on Defendant Kelley is futile follow. Defendant Kelley has served as a director of the Company since 2003. He serves as Chairman of the Executive

committee. He is also a member of the Audit and Governance and Social Responsibility Committees. As a trusted Company director, Chairman of the Executive, and as a member of the Audit and Governance and Social Responsibility Committees, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Kelley signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, too, Defendant Kelley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

250. Additional reasons that demand on Defendant Ralls is futile follow. Defendant Ralls has served as a director of the Company since 2011. He is the Chairman of the Governance and Social Responsibility Committee. He also serves as a member of the Compensation and Executive Committees. As a trusted Company director, Chairman of the Governance and Social Responsibility Committee, and member of the Compensation and Executive Committees, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Ralls signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, too, Defendant Ralls breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

251.    Additional reasons that demand on Defendant Watts is futile follow. Defendant Watt has served as a director of the Company since 2017. He also serves as a member of the Compensation and Environment, Health, and Safety Committees. As a trusted Company director and member of the Compensation and Environment, Health and Safety Committees, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Watts signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, too, Defendant Watts breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

252.    Additional reasons that demand on the Board is futile follow.

253.    Each of the Director-Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of unnecessary and harmful repurchases that caused the Company to overpay by millions of dollars for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

254.    Defendants Boswell, Brock, Delaney, and Watts (the "Environment, Health and Safety Committee Defendants") served as members of the Environment, Health and Safety Committee during the Relevant Period. Pursuant to the Company's Environment, Health and

Safety Committee Charter, the Environment, Health and Safety Committee Defendants are responsible for:

> Overseeing and providing recommendations to the Board of Directors regarding the Company's climate change and sustainability policies and programs, including the Company's commitment to minimizing its impact on the environment and protecting the health and safety of its workers and the communities in which it operates, as well as overseeing and providing recommendations on the reporting and public disclosure thereon.

255.    The Environment, Health and Safety Committee Defendants failed to implement the proper environmental controls and procedures to protect the health and safety of local communities, as they are charged to do under the Environment, Health and Safety Committee Charter, allowing the Company to issue false and misleading public statements during the Relevant Period. Specifically, the Environment, Health and Safety Committee Defendants knew or should have known that Cabot was unsuccessful in fixing the faulty gas well, thereby causing Pennsylvania's water supplies to be polluted through stray gas migration. As a result, the Company issued false and misleading public statement in their SEC filings during the Relevant Period. Thus, the Environment, Health and Safety Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

256.    In violation of the Code of Business Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal environmental controls and procedures, and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Business Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

257.    Cabot has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Cabot any part of the damages Cabot suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

258.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

259.    The acts complained of herein constitute violations of fiduciary duties owed by Cabot officers and directors, and these acts are incapable of ratification.

260.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Cabot. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Cabot, there would be no directors' and officers' insurance protection.

Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

261.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Cabot to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

262.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

263.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

264.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

265.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

266.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

267.    Under the direction and watch of the Director-Defendants, the 2018, 2019 and 2020 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Cabot's environmental controls and procedures with regard to gas wells in Susquehanna County, Pennsylvania were inadequate, as they continuously failed to fix the ongoing stray gas migration in the area; (2) as a result, Pennsylvania's water supplies was polluted and endangering its citizens; (3) consequently, the Company was exposed to heightened governmental scrutiny—despite assurances minimizing the Company's potential environmental  liabilities; (4) Cabot faced potential civil and/or criminal liabilities for its failure to fix the faulty gas wells; (5) these issues would foreseeably impact the Company's reputation and financial projections; and (6) Cabot would be incapable of achieving its growth projections. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

268.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "performance-based pay" elements including linking incentive award opportunities "[t]o encourage management to create sustained value for the shareholders while managing inherent business risks[,]" while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

269.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Business Conduct, due to the Individual Defendants' failures to abide by them, their insider trading, and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

270.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including election of directors and non-binding advisory approval of executive compensation.

271.    The false and misleading elements of the Proxy Statements led to the re-election of Director-Defendants during the Relevant Period, which allowed them to continue breaching their fiduciary duties to Cabot.

272.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

273.    Plaintiff on behalf of Cabot has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

274.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

275.    Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, provides, in relevant part, that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

276.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Cabot. Not only is Cabot now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Cabot by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices during the Relevant Period due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially-inflated prices, damaging Cabot.

277.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce

and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's periodic reports filed with the SEC.

278.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Cabot not misleading.

279.    The Individual Defendants, as top executives, and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Cabot.

280.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives and directors of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

281.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

282.    Plaintiff on behalf of Cabot has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

283.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

284.    Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, provides, in relevant part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation of cause of action."

285.    The Individual Defendants, by virtue of their positions with Cabot and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Cabot and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Cabot and the other Individual Defendants to engage in the illegal conduct and practices complained of herein.

286.    Plaintiff on behalf of Cabot has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

287.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

288.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Cabot's business and affairs.

289.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

290.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Cabot.

291.    In breach of their fiduciary duties owed to Cabot, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Cabot's environmental controls and procedures with regard to gas wells in Susquehanna County, Pennsylvania were inadequate, as they continuously failed to fix the ongoing stray gas migration in the area; (2) as a result, Pennsylvania's water supplies was polluted and endangering its citizens; (3) consequently, the Company was exposed to heightened governmental scrutiny—despite assurances minimizing the Company's potential environmental  liabilities; (4) Cabot faced potential civil and/or criminal liabilities for its failure to fix the faulty gas wells; (5) these issues would foreseeably impact the Company's reputation and financial projections; and (6) Cabot would be incapable of achieving its growth projections. These continuous and material misrepresentation by the defendants during the Relevant Period caused Cabot's stock price to trade at inflated prices. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

292.    The Individual Defendants also failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and

omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

293.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

294.    The Individual Defendants also breached their fiduciary duties by causing the Company to repurchase 48,597,958 million shares of its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while one of them engaged in improper insider sales, netting proceeds of approximately over $1.8 million.

295.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and disguising insider sales.

296.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

297.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Cabot has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

298.    Plaintiff on behalf of Cabot has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

299.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

300.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Cabot.

301.    The Individual Defendants either benefited financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Cabot that was tied to the performance or artificially inflated valuation of Cabot, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

302.    Plaintiff, as a shareholder and a representative of Cabot, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

303.    Plaintiff on behalf of Cabot has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

304.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

305.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Cabot to waste valuable corporate

assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, and to lose financing from investors and business from future customers who no longer trust the Company and its products. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

306.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

307.    Plaintiff on behalf of Cabot has no adequate remedy at law.

### SEVENTH CLAIM

**Against Defendants Dinges and Schroeder for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

308.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

309.    Cabot, along with Defendants Dinges and Schroeder are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Dinges and Schroeder's willful and/or reckless violations of their obligations as officers and/or directors of Cabot.

310.    Defendants Dinges and Schroeder, because of their positions of control and authority as officers and/or directors of Cabot, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Cabot, including the wrongful acts complained of herein and in the Securities Class Action.

311.    Accordingly, Defendants Dinges and Schroeder are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

312.    As such, Cabot is entitled to receive all appropriate contribution or indemnification from Defendants Dinges and Schroeder.

## **PRAYER FOR RELIEF**

313.    FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Cabot, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Cabot;

(c)    Determining and awarding to Cabot the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Cabot and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Cabot and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.  a provision to permit the shareholders of Cabot to nominate at least five candidates for election to the Board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Cabot restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.


Dated: November 13, 2020                          Respectfully submitted,

                                                  **THE ROSEN LAW FIRM, P.A.**

                                                  By: _/s/ Jacob A. Goldberg_
                                                  Jacob A. Goldberg
                                                  101 Greenwood Avenue, Suite 440
                                                  Jenkintown, PA 19046
                                                  Tel: (215) 600-2817
                                                  Fax: (212) 202-3827
                                                  Email: jgoldberg@rosenlegal.com

                                                  *Local Counsel for Plaintiff*

                                                  and

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, New York 11771
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

DocuSign Envelope ID: 550F09DA-2B4F-4A6E-BC82-E35D28C8F78

## **VERIFICATION**

I, Leon Fischer am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2020.

11/3/2020

Leon Fischer

BDBA5E3924D8413...

Leon Fischer